UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>Samuel J. Bourne</u>

  v.           Civil No. 05-cv-365-JD
              Opinion No. 2007 DNH 084
<u>Town of Madison et al.</u>


<u>O R D E R</u>


  Plaintiff Samuel J. Bourne sued the town of Madison, New
Hampshire; its board of selectmen, John Arruda, Clifford Graves,
and Eileen Crafts, each individually and in their official
capacity; and Robert D. King, a Madison resident who had served
on the town's road study committee in 1998, alleging that they
violated state law and deprived him of his constitutional rights.
All of the alleged violations arose from a land use dispute
between Bourne and the town concerning an unpaved access road
leading onto Bourne's property in Madison.[1]  At the core of the
dispute is Bourne's desire to prevent public traffic -- <u>viz.</u>,
snowmobile traffic -- on the access road, which the town claims
is a public road.

---

  [1]Bedrock Realty Trust owns the property at issue.  Bourne
and his wife had created Bedrock for the purpose of buying the
property.  After the dispute with the town began, Bourne's wife
removed herself as a trustee leaving Bourne as the sole trustee
of Bedrock.  For ease of reference, the court will refer to both
Bourne and Bedrock as "Bourne."

The defendants move for summary judgment and Bourne objects. After Bourne filed his objection, the court granted, in part, Bourne's motion to amend the complaint and permitted both parties to file supplemental memoranda with regard to the defendants' summary judgment motion. <u>See</u> Order of December 5, 2006 (document no. 33).

In response to an order to show cause, the defendants also filed a motion to dismiss or to stay adjudication of Bourne's claims pending the resolution of related state proceedings in the Carroll County Superior Court.  During a telephonic scheduling conference, the parties agreed to a stay of the trial in this case pending a final judgment by the state court.  <u>See</u> Order of May 3, 2007 (document no. 93).  The parties further agreed that the court should proceed to rule on any pending motions and the court accordingly ruled on the parties' respective motions in limine.  <u>See</u> Order of May 9, 2007 (document no. 95).  The court now considers the defendants' motion for summary judgment, Bourne's objection, and the parties' supplemental memoranda.

## I.  Background

Bourne, a resident of Massachusetts, retained a real estate agent in New Hampshire in the summer of 2002 for the purpose of finding a wooded lot on which to build a family vacation home.

Bourne found a fifty-acre tract with a small pre-existing cabin in the town of Madison in Carroll County.  The property is accessible by an unpaved road, called "Solomon Harmon Road," that connects with East Madison Road on its north end.  The southern side of the Bourne property abuts a large conservation parcel known as the "McNair property," on which the town permits snowmobile use.

Before Bourne purchased the property, his real estate agent informed him that Madison has historically considered Solomon Harmon Road to be a class VI highway under state law.[2]  Earlier in the year, the town had adopted a regulation authorizing the use of snowmobiles on certain class VI roads, including Solomon Harmon Road.  The town maintains that an easement that runs concurrently with the road and that was granted to the town in the 1970s, extends a north-south public trail from East Madison Road to the McNair property.

---

[2]Class VI highways generally consist of "public ways" not otherwise classified by New Hampshire law, including "all highways discontinued as open highways and made subject to gates and bars . . . and all highways which have not been maintained and repaired by the town in suitable condition for travel thereon for 5 successive years or more . . . ."  N.H. Rev. Stat. Ann. ("RSA") § 229:5, VI.  Class VI highways are "full public highways that the public has a right to pass over."  Glick v. Ossipee, 130 N.H. 643, 646 (1988).

Before Bourne completed purchase of the fifty-acre lot, he was informed by the town administrator that, to obtain a building permit, he would first need to execute a waiver agreement relieving the town from maintenance responsibilities and from liability with respect to travelers on Solomon Harmon Road.  A standard form waiver agreement was faxed to Bourne.  He forwarded the agreement to his attorney who revised it by adding two terms favorable to Bourne:  (1) that the public could not use the stretch of Solomon Harmon Road on his property, (with exceptions for police and fire emergencies), and (2) that the town "would never reclassify Solomon Harmon Road" without Bourne's consent. First Bourne Aff., Ex. 4.

Bourne mailed the "revised waiver" back to the selectmen with a cover letter.  The parties dispute the substance of the cover letter and have each submitted what they claim to be the cover letter received by the selectmen on August 26, 2002. Bourne's version of the cover letter specifically requests the selectmen to "review" the "revised" waiver agreement.  First Bourne Aff., Ex. 5.  The cover letter produced by the town makes no mention of any revisions to the agreement and does not invite the selectmen to review it.  Arruda Aff., Ex. 4.  The defendants contend that the selectmen assumed that Bourne had simply signed the standard form waiver without change.  The selectmen admit

4

that they did not read the revised waiver before they signed and
notarized it on August 28, 2002.  Two days later, it was recorded
at the Carroll County Registry of Deeds, and on September 30,
2002, Bourne completed purchase of the fifty-acre lot.

Bourne then erected a chain across Solomon Harmon Road at
the entrance to his property.  Robert Babine, the Madison code
enforcement officer, learned of the chain and removed it.  After
Bourne complained to the town about the removal of his chain,
Selectman John Arruda discovered that the executed waiver
agreement was not the standard form waiver.  Arruda sent Bourne a
letter stating that the revised waiver was "invalid" because the
selectmen lacked the authority to restrict public access to a
town road without convening a town meeting.  Arruda stated that
if Bourne wanted a building permit, "it would be in [his] best
interest to sign the attached [standard form waiver] agreement."
First Bourne Aff., Ex. 7.

Undeterred, Bourne hired a contractor to install a gate
across Solomon Harmon Road in early November 2002.  Bourne's
attorney told Bourne that counsel for the town had agreed that he
could install a gate so long as it was held open at all times.
Nevertheless, while Bourne's contractor was in the process of
pouring a foundation for the gate, Babine approached him and told

him that the town would remove any gate erected across the road. Bourne's contractor completed the installation.

On November 11, 2002, Robert King sent a memorandum to the board of selectmen with the subject heading:  "Granting of building permits on Solomon Harmon Road and other Class VI roads."  Id., Ex. 13.  King had served on the 1998 Madison Class VI Road Study Committee that had created a report identifying Solomon Harmon Road as a class VI road.  In his November 11 memorandum, King advised the selectmen concerning the town's dispute with Bourne.  He stated that the revised waiver was invalid and that the selectmen should endeavor to have a new agreement executed and recorded to "cancel[] out the existing agreement."  Id.  He also recommended that the town remove Bourne's newly erected gate.  Anticipating a lawsuit, King suggested that the town's defense should be "to show that the unlawful provisions were originated and sneaked into the [revised waiver] by the Bournes, [sic] not by the Selectmen, and that accordingly it is they, not the Selectmen, who caused the agreement to be legally invalid."  Id.

The following day, Babine denied Bourne's application for a building permit citing five reasons:  the revised waiver was void, Bourne's application did not show the location of the new

6

house in relation to the land in "current use,"[3] the application
did not indicate the set-backs from the class VI road,
construction of a second dwelling would violate a zoning
ordinance, and Bourne needed approval from the State Wetlands
Bureau.  Babine Aff., Ex. 1.

On November 25, town counsel sent a letter to Bourne's
attorney stating, inter alia, that Bourne would need to either
remove his gate or position it in such a way that it is always
open.  The letter stated that if he refused to comply by December
1 the town would remove the gate.  The letter also accused
Bourne's attorney of "hiding" her involvement in revising the
waiver agreement and of "sandbagging" the town by submitting the
revised waiver without a cover letter alerting the selectmen to
the changes.  First Bourne Aff., Ex. 15.  The town removed the
gate on December 4.

On January 10, 2003, the town filed suit in Carroll County
superior court seeking rescission of the revised waiver and an
injunction to prevent Bourne from interfering with the public's

---

[3]"Current use" is a term of art relating to New Hampshire's
tax code.  In order to encourage the preservation of open space,
the tax code allows undeveloped land to be taxed at a reduced
rate based on its "current use" value as opposed to the real
estate market value.  See RSA 79-A et seq.; Dana Patterson, Inc.
v. Town of Merrimack, 130 N.H. 353, 355 (1988).  Forty-nine acres
of Bourne's fifty-acre tract was designated as "current use."

access to Solomon Harmon Road.  At the injunction hearing, the town produced its version of Bourne's August 26, 2002, cover letter.  Bourne thereafter filed a petition with the superior court accusing the town of forging the cover letter.  Bourne asked the superior court to uphold the revised waiver and to order the town to issue a building permit.

Before the superior court could rule, Arruda approached Bourne with a settlement proposal.  He told Bourne that if he signed a new waiver agreement, the town would drop its lawsuit and grant him a building permit.  According to Bourne, Arruda also promised that, following a hearing, the selectmen would be able to relocate the public trail to the outside perimeter of the Bourne property so that public use of the trail would not interfere with his use and enjoyment of the property.  Bourne accepted Arruda's offer.[4]

---

[4]After this lawsuit settled in May 2003, Bourne wrote a letter to town counsel in October 2003 accusing the town of forging his signature.  Both the town and Bourne subsequently hired handwriting analysts.  The town's analyst concluded that the signature on the town's version of the cover letter was genuine, while Bourne's analyst believed it was forged.  When Bourne later learned that the Carroll County Sheriff had issued a warrant for his arrest for making "false claims," he submitted his analyst's affidavit to the sheriff.  Bourne alleges that, although the sheriff thereafter withdrew the arrest warrant, the investigation remained open and the police pressured Bourne to retract his accusation.

On April 12, 2003, Bourne signed a new waiver (the "second waiver"), which stated that it "supersede[s] an agreement dated August 28, 2002, recorded on August 30, 2002, at the Carroll County Registry of Deeds . . ., which parties agree is void as ultra vires."  Defense Counsel Aff., Ex. 4.  In the second waiver, the town "agreed to issue a building permit for the construction of a residence . . . and a license to maintain that portion of Solomon Harmon Road serving as access to the [Bourne] Property as if a private driveway," so long as Bourne would "maintain said roadway" and not hold the town liable for any injuries or damages occurring on the road.  <u>Id.</u>  The second waiver made no mention of relocating the public trail.  Following the stipulated dismissal of the town's lawsuit in May, Bourne and the town executed a "mutual release" of all claims "arising out of" that action, with the exception that Bourne could seek to adjudicate the legal status of the access road.  <u>Id.</u>, Ex. 6.

The town issued Bourne a building permit on May 7, 2003. Following a public hearing, the selectmen denied Bourne's petition to relocate the public trail, stating that the public interest in maintaining the present location of the right-of-way outweighed Bourne's private interest.  In particular, the selectmen found that, because the trail "runs coincident with" a recorded easement, "it would be contrary to the public interest

to move the class VI road to be in a different location than the . . . easement."  First Bourne Aff., Ex. 18.

In October 2003, the Madison Planning Board denied Bourne's request for a permit to subdivide his property into four lots because the Board found, inter alia, that the access road to the property did not meet the width specifications of the town's subdivision regulations.  First Bourne Aff. ¶ 35.  In February 2004, the town revoked Bourne's building permit.  Id. ¶ 32.  According to a letter signed by Babine, "[o]ne of the conditions [of the permit] was that the land area where the new house is to be constructed be taken out of current use status."  Id., Ex. 21.  Babine's letter stated that the town was revoking the permit because that condition had not been met, but that the permit could be reissued if Bourne resolved the problem.  Id.

Bourne also claims that the defendants interfered with his attempts to improve his property and the access road.  In December 2003, Bourne hired a contractor to lay crushed stone and gravel on the road.  The Madison chief of police, John Pickering, purportedly on directions from the selectmen, ordered Bourne's contractor to cease work on the road because he was not using the proper grade of gravel.  In May 2004, Bourne hired the New Hampshire Electrical Cooperative to install power lines along the Solomon Harmon Road onto Bourne's property.  The installation was

delayed when the selectmen informed the Electrical Cooperative that it needed to obtain pole setting permits.  Id., Ex. 28. Bourne alleges that the town "refused to execute a conditional license to allow the Co-op to proceed with the installation." Id. ¶ 38.  As a result, he claims that he was forced to pay his neighbor for an easement over which to run the power lines.

Following settlement of the town's lawsuit, Bourne initiated several suits of his own in the Carroll County Superior Court. In May 2003, he petitioned the superior court to overturn the town's denial of his petition to relocate the Solomon Harmon Road.  In September 2003, he challenged the legal status of the Solomon Harmon Road, asking the superior court to remove the class VI classification and deny the town's claim to an easement running over the road.  He also requested an injunction against snowmobiling on the road.  In February 2005, he filed a third action in superior court, challenging the selectmen's approval of a neighbor's petition to lay out a class VI road over the Solomon Harmon Road.  These three actions were consolidated with a fourth lawsuit brought against Bourne by two of his neighbors.  Defense Counsel Aff. ¶¶ 6-8.  In the course of the state proceedings, both parties have petitioned the superior court for temporary relief on a number of issues.  In one of the court's rulings,

11

Bourne was ordered to remove the crushed stone and gravel that he had laid on the Solomon Harmon Road.

Bourne commenced the present action in June 2005 by filing a complaint in Massachusetts federal district court alleging that the defendants had violated New Hampshire law and his constitutional rights.  The case was transferred to this court in October 2005.  The court subsequently granted Bourne's motion to amend the complaint in part.  See Order of December 5, 2006 (document no. 33).  As it now stands, Bourne's second amended complaint claims, under 42 U.S.C. § 1983, that the defendants' conduct deprived him of his constitutional rights to due process and equal protection.  He also alleges claims arising under New Hampshire common law:  breach of the revised waiver, fraud, negligent misrepresentation, and tortious interference with contractual relations.  He seeks monetary damages and an injunction ordering the defendants to grant him a building permit.

## II.  Summary Judgment

The defendants contend that Bourne has failed to raise a sufficient issue of material fact with respect to his Fourteenth Amendment claims.  Specifically, the defendants argue that Bourne has not demonstrated violations of his constitutionally protected

rights to due process or equal protection.  In the alternative, the defendants claim that they are entitled to qualified immunity on the § 1983 claims.  Additionally, the defendants argue that the state law claims should be dismissed on summary judgment.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A party opposing a properly supported motion for summary judgment must present competent evidence of record that shows a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  The record evidence is construed in the light most favorable to the nonmoving party and all reasonable inferences are construed in that party's favor.  See Mauser v. Raytheon Co. Pension Plan for Salaried Employees, 239 F.3d 51, 56 (1st Cir. 2001).

A "material fact" is one that "has the potential to change the outcome of the suit under the governing law" and a factual dispute is "genuine" if "the evidence about the fact is such that

a reasonable jury could resolve the point in favor of the nonmoving party."  <u>Grant's Dairy--Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.</u>, 232 F.3d 8, 14 (1st Cir. 2000). The party that would bear the burden of proof at trial cannot rely on speculation or conjecture and instead must present sufficient evidence on essential factual elements of each claim to generate a trial-worthy issue.  <u>See</u> <u>In re Spigel</u>, 260 F.3d 27, 31 (1st Cir. 2001).  An absence of evidence on a material issue weighs against the party who would bear the burden of proof at trial on that issue.  <u>See</u> <u>Perez v. Volvo Car Corp.</u>, 247 F.3d 303, 310 (1st Cir. 2001).

## A.  Procedural Due Process

Bourne alleges that the defendants' failure to provide him with adequate notice and a hearing before removing his gate on December 4, 2002, violated state law, <u>see</u> N.H. Rev. Stat. Ann. ("RSA") 231:21 (providing that gates and bars may be removed from highways "upon like proceedings as in the laying out of highways"), and his procedural due process rights.  The defendants argue that Bourne cannot establish a procedural due process violation because sufficient post-deprivation relief was available to him.  Bourne responds that the defendants did not have a sufficient basis to remove the gate without notice and a

14

hearing because he has established that the gate had remained open at all times and, therefore, it did not interfere with public traffic.

The court assumes, arguendo, that the defendants, including King, deprived Bourne of a property interest while acting under the color of state law.  See SFW Arecibo, Ltd. v. Rodriguez, 415 F.3d 135, 139 (1st Cir. 2005) (outlining the elements for a procedural due process claim under § 1983).  The First Circuit has long recognized that the failure to provide pre-deprivation process does not violate procedural due process when the deprivation of property "results from conduct of state officials violative of state law."  PFZ Props., Inc. v. Rodriguez, 928 F.2d 28, 31 (1st Cir. 1991) (citing Parratt v. Taylor, 451 U.S. 527, 543 (1980)).  Thus, in a case such as this, where the plaintiff's constitutional claim relies on an alleged violation of state law, "the only question is whether the post-deprivation process available to [the plaintiff] was adequate."  Id.

Bourne does not argue that the post-deprivation relief available to him was inadequate.  The defendants have produced the affidavit of the Madison town administrator stating that the town has a zoning board of adjustment that "is available to hear and decide appeals if it is alleged that the Board of Selectmen or its Building Inspector has made an error in any order,

15

requirement, decision, or determination relating to land use and building matters." Melissa S. Arias Aff. at 2; see also RSA 677:2 (providing that any person affected by a decision of a local legislative body or the local board of adjustment relating to zoning may apply for rehearing). New Hampshire law additionally provides a mechanism for superior court review of decisions made by local legislative bodies and local boards of adjustment. See RSA 677:4 ("Any person aggrieved by any order or decision of the zoning board of adjustment or any decision of the local legislative body" may petition the superior court within thirty days). Because Bourne has failed to establish a lack of adequate post-deprivation remedies, the court grants the defendants' motion for summary judgment as to Bourne's procedural due process claim. See SFW Arecibo, 415 F.3d at 139-40; PFZ Props., 928 F.2d at 31; cf. Amsden v. Moran, 904 F.2d 748, 757 (1st Cir. 1990) (noting that a procedural due process claim under § 1983 is not complete "unless and until the State fails to provide due process") (internal quotation marks omitted).

**B.  Substantive Due Process**

Recognizing the First Circuit precedent disfavoring substantive due process and equal protection claims arising out of land use disputes, Bourne attempts to cast his case as being

about a wide-ranging conspiracy involving official corruption.
He also seeks to demonstrate that the defendants' conduct was
part of a "pattern of abuse based upon personal hostility."
Bourne Obj. at 15.   The defendants, he argues, abused their
positions and conspired with others, including Bourne's
neighbors, the local police, and the Carroll County Sheriff, in
an effort to force him out of town.  The defendants argue that
Bourne's allegations, even if taken as true, are insufficient to
meet the onerous "shocks the conscience" standard required to
succeed on a substantive due process claim.

    Meritorious substantive due process claims in the context of
a land use dispute are rare.  See, e.g., SFW Arecibo, 415 F.3d at
141; PFZ Props., 928 F.2d at 31.  A plaintiff seeking to prove a
substantive due process violation must show "both that the acts
[of the defendants] were so egregious as to shock the conscience
and that they deprived him of a protected interest in life,
liberty, or property."  Pagan v. Calderon, 448 F.3d 16, 32 (1st
Cir. 2006) (emphasis in original).  To "shock the conscience,"
the defendants' conduct "must at the very least be extreme and
egregious, . . . or, put another way, truly outrageous,
uncivilized, and intolerable."  Id. (internal quotation marks and
citations omitted).  Significantly, "[m]ere violations of state
law, even violations resulting from bad faith, do not invariably

amount to conscience-shocking behavior." Id. (internal quotation marks omitted). In all but the most extraordinary cases, the substantive due process doctrine may not be invoked "to challenge discretionary permitting or licensing determinations of state or local decisionmakers, whether those decisions are right or wrong." Id. at 33; PFZ Props., 928 F.2d at 31 ("This Court has repeatedly held . . . that rejections of development projects and refusals to issue building permits do not ordinarily implicate substantive due process.").

Bourne argues, nevertheless, that the First Circuit has "not ruled out the possibility of a substantive due process claim based upon personal hostility towards the applicant," Mongeau v. City of Marlborough, 462 F. Supp. 2d 144, 151-52 (D. Mass. 2006), and that the circuit has similarly "left the door slightly ajar" for "federal relief in truly horrendous situations," such as cases involving claims of official corruption, bribery, or political threats. Nestor Colon Medina & Sucesores v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992); but see id. at 47 (declining to decide whether such conduct violates due process); Raskiewicz v. Town of New Boston, 754 F.2d 38, 44 (1st Cir. 1985) (noting that charges of bad faith in land use cases are "commonplace" and that if "all that were required to secure federal jurisdiction were

loose claims of conspiracy and corruption, virtually any case of this type could be brought into the federal court").

Even assuming the First Circuit would recognize a § 1983 due process action in the circumstances outlined in <u>Nester Colon</u>, Bourne has not established a sufficient factual basis in support of such a claim here.  <u>See</u> 964 F.2d at 45 (noting that the "threshold for establishing the requisite 'abuse of government power' is a high one indeed").  Although Bourne speculates that the defendants' conduct stemmed from personal hostility against him, he has not pointed to specific evidence supporting this accusation apart from cataloguing the actions taken by the town that were adverse to his interests.

A party opposing summary judgment "may not rest upon mere allegations; [he] must set forth specific facts demonstrating that there is a genuine issue for trial."  <u>Hoeppner v. Crotched Mountain Rehab. Center, Inc.</u>, 31 F.3d 9, 14 (1st Cir. 1994) (internal quotation marks omitted).  Even in cases where the critical element is the subjective motivation of the defendant, "the plaintiff cannot survive summary judgment with unsupported allegations and speculations, but rather must point to specific facts detailed in affidavits and depositions--that is, names, dates, incidents, and supporting testimony--giving rise to an inference of . . . animus."  <u>Id.</u> (internal quotation marks

omitted); see also Amsden, 904 F.2d at 757 ("Charges that substantive due process was denied cannot rest on conclusory allegations or rhetoric alone (even impassioned rhetoric).").

It is undisputed that the town reached determinations and took actions that Bourne did not like.  Although Bourne may have disagreed, the town provided rational explanations for its decisions.  See supra at 5-11.  Bourne has not adduced competent evidence undermining the veracity of these explanations or corroborating his own speculation that they were motivated by personal animus.  Nor has he presented sufficient competent evidence to establish a conspiracy among Madison public officials to force him out of town.  Simply put, on the record established here, a fact-finder could not reasonably infer that the defendants were motivated by personal animosity or that they conspired against him.[5]

_____

[5]Although the defendants do not raise the argument, the court also notes that Bourne's two affidavits, upon which his entire case depends, are patently defective and have no evidentiary value.  Both of Bourne's affidavits are unsworn, and neither meet the statutory requirements for unsworn declarations. See 28 U.S.C. § 1746 (providing that, to have the effect of a sworn declaration, unsworn declarations must include an affirmation from the declarant that "under penalty of perjury . . . the foregoing is true and correct"); Fed. R. Civ. P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

Bourne argues that the town improperly conditioned his right
to a building permit on the surrender of his private property
rights.  The town offered a rational reason, however, which was
linked to a legitimate governmental interest (preserving free
passage on the public throughways) for the position it took.  See
PZF Props., 928 F.2d at 31-32.  Even if the defendants were
mistaken in their treatment of the Solomon Harmon Road as a class
VI road, the defendants' conduct did not rise to the level of
conscience shocking, especially where the superior court provided
a readily available forum for correcting any errors by the town.
See id. ("[A] mere bad faith refusal to follow state law in such
local administrative matters simply does not amount to a
deprivation of due process where the state courts are available
to correct error.") (internal quotation marks omitted).

To be sure, Bourne's claims that the defendants forged a
cover letter, and that, when accused of the forgery, they
retaliated by pressuring the Carroll County Sheriff and the
county attorney to bring criminal charges against Bourne, are
more serious.  Again, however, Bourne does not support these
claims with competent evidence.  Bourne's proposed handwriting
expert opined that the handwritten signature appearing on the
town's version of the cover letter is not Bourne's, and that the
computer-generated character impressions on the allegedly forged

cover letter are consistent with similar impressions on documents known to have been created by the town.  The court has ruled, however, that Bourne's expert is not qualified to testify as an expert on the latter subject and that the methodology he employed with respect to the former subject is unreliable.  See Fed. R. Evid. 702 (expert testimony must be relevant and reliable).  The court accordingly granted the defendants' motion to exclude Bourne's expert testimony.  See Order of May 9, 2007 (document no. 95).  Even if Bourne could establish the falsity of the signature by other means (e.g., by having the trier of fact compare the questioned signature with known Bourne signatures), he has not shown how he would prove that the document originated from the defendants.

More importantly, even assuming Bourne could establish that a town official forged the cover letter, that act, by itself, would not rise to the level of conscience shocking misconduct. Bourne's contention that the defendants wrongfully conspired with and pressured the county sheriff to bring meritless charges against him in order to coerce him to drop his forgery accusation is also unsupported.  The documents Bourne points to merely establish that the selectmen initiated an investigation by

informing Chief Pickering about Bourne's forgery claim.[6]
Anticipating a jurisdictional problem and seeking to avoid the
appearance of a conflict of interest, Pickering transferred the
investigation to the county sheriff who, in May 2004, issued
criminal complaints for "unsworn falsification" and for bringing
a "false report to law enforcement."  Those complaints were
ultimately dropped.

The record establishes that the county sheriff's
investigation was not influenced by the defendants.  In an
affidavit, Michael Santuccio, a sergeant of the Carroll County
Sheriff's Office, states that Chief Pickering asked him "to
investigate mutual allegations of forgery by Samuel Bourne and
the Town of Madison Board of Selectmen."  Santuccio Aff. ¶ 3.

---

[6]Bourne's allegations are largely based on two letters.  The
first letter, from Chief Pickering to an attorney at the Carroll
County Attorney's Office, dated December 15, 2003, simply shares
the findings of the Madison police department's investigation,
including the opinion of the town's handwriting analyst, that the
signature on the town's version of the cover letter was not
forged.  The letter concludes by inquiring as to possible charges
that could be brought against Bourne for making false
accusations.  See First Bourne Aff., Ex. 15.  Over a year later,
town counsel for Madison wrote a letter requesting the county
attorney to issue a final report of his findings, and, "if called
for, appropriate criminal charges."  Second Bourne Aff., Ex. 14.
Although both letters urge action, they do not display an attempt
to exert undue pressure on the county attorney to bring
unwarranted charges against Bourne.  Indeed, Bourne was never
arrested or formally charged with a crime, and the complaints
against him were ultimately dropped.

The sergeant affirms that his "role was to make an independent determination as to whether either Mr. Bourne or a member of the Town of Madison Selectmen had committed a forgery and, if so, whether criminal charges should be pursued." Id. He further states that he did not receive any direction from nor was he influenced by any Madison officials. Id. ¶ 5. The sergeant ultimately concluded that there was insufficient evidence to bring charges against either Bourne or the selectmen. See Attach. to Santuccio Aff. Santuccio's affidavit, which is not challenged by Bourne, undermines his conspiracy theory. See Raskiewicz, 754 F.2d at 45 (noting that on a motion for summary judgment the court is "required to respect all inferences that reasonably can be drawn from the facts, but [it] cannot ignore uncontested facts that render inferences unreasonable or . . . fantastic").

At most, the record here suggests that the Madison selectmen were overly assertive in their defense of the town's class VI roads. As even Bourne has pointed out, however, he is not the only property owner in Madison that has tussled with the town concerning a class VI road.[7] Perhaps, as Bourne suggests, the

---

[7]At a Madison town meeting in 2000, the town formally accepted the findings of the 1998 Madison Class VI Road Study Committee and adopted Article 26 mandating that the selectmen would use "every reasonable effort" to defend against any

24

defendants were motivated by a desire to promote a snowmobile
trail system in Madison.  Even assuming that to be the case, the
town's efforts to assert more control over roads it believes to
be public is, "at worst, political decision making based on the
sort of parochial view [] of local interests held not to violate
substantive due process."  Nestor Colon, 964 F.2d at 47 (noting
that the "political animus" in that case "was based on the fact
that a large number of [town] residents did not want a hazardous
waste dump in [their town]"); see also Chiplin Enters. v. City of
Lebanon, 712 F.2d 1524, 1525 (1st Cir. 1983) (finding no
substantive due process claim where the plaintiff alleged that
the town had "maliciously den[ied] it a building permit for
invalid and illegal reasons and in bad faith").[8]

---

challenges to any class VI road unless the chances of a
successful defense were "remote."  Second Bourne Aff., Ex. 4.
Pursuant to that article, the selectmen litigated a challenge
against a class VI road brought by Dr. David Riss, another
Madison landowner.  See Second Bourne Aff. ¶¶ 9-10.

[8]Bourne argues that a memorandum from Robert King to the
selectmen provides evidence of a plan "of 'targeting non
residents' or other Class VI road property owners in a conspiring
plot."  Bourne's Supp. Mem. at 12.  That memorandum, however,
merely informs the selectmen of the Class VI Roads Study
Committee's efforts to notify all affected landowners of the
committee's findings and notes that its "focus has been on new
and nonresident land owners who are unlikely to be aware of our
work."  Second Bourne Aff., Ex. 6.

In sum, although the summary judgment record is viewed in the light most favorable to Bourne, speculation and conjecture need not be credited.  On the record established here, a trier of fact could not reasonably conclude that the defendants' conduct was so "horrendous" as to amount to a deprivation of constitutional magnitude.  See Amsden, 904 F.2d at 757.

## C.  Equal Protection

Bourne's equal protection claim fails for the same reasons his substantive due process claim fails.  Because Bourne has not alleged "invidious discrimination based on a prohibited category such as race or sex," nor has he "pointed to an egregious procedural irregularity," SFW Arecibo, 415 F.3d at 142, he can only prevail on an equal protection claim by establishing "differential treatment" and "a gross abuse of power."  Pagan, 448 F.3d at 34.  The "gross abuse of power" category has been equated "with the 'shocks the conscience' concept used in substantive due process cases."  Id.  As in the substantive due process context, "[e]ven an arbitrary, bad faith denial of a benefit in derogation of state law, without more, will not cross the constitutional threshold needed for an equal protection claim."  Id. at 35.  On this record, a jury could not reasonably

find an actionable deprivation of Bourne's equal protection
rights.  See PFZ, 928 F.2d at 32-33.


## D.  Qualified Immunity

The court also agrees with the defendants' alternative
argument that, even if Bourne had raised a triable issue with
regard to his due process or equal protection claims, the
defendant selectmen, Arruda, Graves, and Crafts, are entitled to
qualified immunity to the extent they are sued in their
individual capacities.[9]  The qualified immunity doctrine shields
government officials performing discretionary functions from
civil damages "insofar as their conduct does not violate clearly
established statutory or constitutional rights of which a
reasonable person would have known."  Harlow v. Fitzgerald, 457
U.S. 800, 818 (1982); see also Pagan, 448 F.3d at 31 (setting out
a three-part qualified immunity test and noting that it "protects
all but the plainly incompetent [and] those who knowingly violate
the law") (internal quotation marks omitted).

At most, Bourne's constitutional claims are based on
allegations that Madison public officials conspired to drive him

---

[9]The defendants do not argue that qualified immunity would
shield Robert King.  The defendants have also not directly
challenged Bourne's effort to establish municipal liability.  See
Monell v. Dep't of Social Servs., 436 U.S. 658, 691 (1978).

out of town.  In light of the First Circuit's reluctance to
explicitly recognize a cause-of-action under § 1983 for
allegations of official corruption, <u>see, e.g.</u>, <u>Nestor Colon</u>, 964
F.2d at 47 (declining to decide); <u>Raskiewicz</u>, 754 F.2d at 44-45
(doubting federal jurisdiction over "loose claims of conspiracy
and corruption"), a constitutional right to be free from such
conduct could not be said to be clearly established.  <u>Cf.</u>
<u>Mongeau</u>, 462 F. Supp. 2d at 151-52.  Nor would a reasonable
person have known, in the circumstances of this case, that the
challenged conduct amounted to constitutional infringement.

**E.  State Constitutional Claims**

Citing Part 1, Article 1, and Part 1, Article 14 of the New
Hampshire Constitution, Bourne alleges that the defendants'
conduct also violated his state constitutional rights to due
process and equal protection.  Because 42 U.S.C. § 1983 only
affords a civil remedy for the deprivation of rights secured
under federal law, <u>see</u> <u>Williams v. City of Boston</u>, 784 F.2d 430,
433 (1st Cir. 1986) (citing <u>Parrat v. Taylor</u>, 451 U.S. 527, 535
(1981)), and New Hampshire does not have its own statutory
equivalent to § 1983, Bourne is presumably asking the court to
imply a civil remedy here.  <u>See</u> Sharon N. Humble, <u>Implied Cause</u>

of Action for Damages for Violation of Provisions of State
Constitutions, 75 A.L.R. 5th 619 (2000).

      The New Hampshire Supreme Court, however, has been
reluctant to expressly recognize such remedy.  The only New
Hampshire Supreme Court decision directly addressing this issue
declined to imply, on the facts of that case, a cause of action
premised on violations of the New Hampshire equal protection and
due process provisions.  See Rockhouse Mountain Prop. Owners
Assoc., Inc. v. Town of Conway, 127 N.H. 593, 597–601 (1986)
(declining to create a "constitutional tort" in a case involving
a dispute over the town's denial to lay out a road); see also 14
Peter J. Loughlin, New Hampshire Practice: Local Government Law §
1106, at 372 (1995).

      It is well established in the First Circuit that plaintiffs
"who reject a state forum in order to bring suits in federal
court under diversity jurisdiction cannot expect that new trails
will be blazed."  Wilson v. Bradlees of New England, Inc., 250
F.3d 10, 16 (1st Cir. 2001); Andrade v. Jamestown Hous. Auth., 82
F.3d 1179, 1187 (1st Cir. 1996) (recognizing that a federal court
sitting in diversity "must take state law as it finds it, not as
it might conceivably be, some day; nor even as it should be"
(internal quotation marks omitted)).  As the New Hampshire
Supreme Court has not yet recognized an implied right to damages

for violations of Part 1, Articles 1 and 14 of the state
constitution, the court will not entertain an action for damages
on such grounds here.  Cf. Penney v. Town of Middleton, 888 F.
Supp. 332, 342 (D.N.H. 1994).

     In any event, New Hampshire's due process and equal
protection provisions appear to overlap the same federal
constitutional provisions.  Bourne has not argued that the New
Hampshire Constitution offers more protection than the Fourteenth
Amendment in these circumstances, and the court has no reason to
believe that it does.  Thus, even if the New Hampshire Supreme
Court would recognize a private right of action here, Bourne has
not established that he could prove a state constitutional
violation for the same reasons outlined in the above analysis of
the federal constitutional claims.

## F.  State Common Law Claims

     Bourne alleges that the defendants negligently
misrepresented their assent to the revised waiver, then breached
the revised waiver, and finally fraudulently induced Bourne to
agree to rescind the revised waiver.  Additionally, Bourne
alleges the town tortiously interfered with his contractual
relations.  Although Bourne's second amended complaint names "all
defendants" with respect to the constitutional claims, the state

claims specifically name the town and selectmen, John Arruda, Clifford Graves, and Eileen Crafts.  Robert King, therefore, is not a defendant to these claims.

### 1.  Federal Jurisdiction

The defendants ask the court to dismiss the state claims in toto.  They argue that, should the court grant summary judgment as to the federal claims, "this case [would] no longer [have] sufficient value to maintain federal jurisdiction."  Presumably the defendants are arguing that the dismissal of the federal claims reduces the amount in controversy below the threshold for diversity jurisdiction.  See 28 U.S.C. § 1332.  But it has long been established that the court determines the amount in controversy with reference to the circumstances existing at the time the complaint was filed.  Conventry Sewage Assocs. v. Dworkin Realty Co., 71 F.3d 1, 6 (1st Cir. 1995).  Moreover, once jurisdiction has been established, based on a jurisdictional amount alleged in good faith, it cannot be "ousted by a subsequent change of events," including when summary judgment is granted on some claims but not others.  Id. at 7 (citing Klepper v. First Am. Bank, 916 F.2d 337, 340 (6th Cir. 1990)).  The court therefore retains jurisdiction to consider Bourne's state law claims.

## 2.  **Enforceability of the Mutual Release**

Another threshold issue that must be resolved before considering the merits of Bourne's state law claims is the effect of the mutual release.  Shortly after Bourne and the town agreed to settle the town's 2003 lawsuit, in which the town sought rescission of the revised waiver, the parties executed a mutual release agreement purporting to waive "all claims arising out of" that suit.  The defendants argue that the mutual release bars the state law claims pertaining to the revised waiver.

The town's lawsuit began in January 2003 when the town petitioned the Carroll County Superior Court to rescind the revised waiver on the theory that it was void ab initio.  The town argued that Bourne had deceived the selectmen by failing to inform them in his cover letter that he had added material terms to the agreement and that, lacking such notice, the selectmen signed the agreement assuming that it was the standard form waiver agreement.  Additionally, the town argued that the selectmen lacked the authority to unilaterally transfer the rights in a town road to a private citizen.  The town argued that it could only convey property rights or discontinue a town road through a town meeting.  Bourne responded with his own petition accusing the town of manipulating his cover letter.  He asked the

court to uphold the revised waiver and to order the town to issue him a building permit.

The superior court never ruled on these issues because the parties jointly stipulated to dismissal of the action.  In April 2003, Bourne signed the second revised waiver that specifically stated the intention of the parties "to supersede [the revised waiver], which parties agree is void as ultra vires."  Defense Counsel Aff., Ex. 4.  In May of 2003, the parties stipulated to docket markings dismissing the state action with prejudice.  The parties stipulated that judgment should be entered for "neither party," and that no fees, costs, or interest should be assessed to either side.  Defense Counsel Aff., Ex. 5.

Later that month, Bourne and the town executed a "mutual release of claims."  Defense Counsel Aff., Ex. 6.  That release provided that:

> TOWN OF MADISON, and its agents, employees, administrators, executors, affiliates, successors and assigns, hereby release, and are released by, BEDROCK REALTY TRUST, and their agents, employees, administrators, executors, affiliates, successors, and assigns, from all claims arising out of the matter known as Carroll County Superior Court Docket Nr. 03-E-005.  All claims by any of the parties hereto are forever discharged, waived and remised, with the exception that Bedrock Realty Trust does not waive its right to challenge/clarify by appropriate legal action the use of the right-of-way (including issues of motorized vehicles and snowmobiles) over their property heretofore identified as Solomon Harmon Road as they [sic] same may have been limited by easement conveyance

> to the Town of Madison.  <u>The purpose of this mutual
> release is to buy peace, terminate all other disputes
> and further litigation</u>.  This release is given and
> received in settlement of disputed matters and does not
> operate as an admission of liability by any of the
> signatories.

<u>Id.</u> (emphasis added).

Although the superior court never entered judgment in the

town's lawsuit, the defendants correctly assert that the

settlement of a lawsuit can have preclusive effects on a

subsequent lawsuit.  <u>See</u> <u>Nottingham Partners v. Trans-Lux Corp.</u>,

925 F.2d 29, 31-32 (1st Cir. 1991).  Release is an affirmative

defense with the burden of establishing its applicability resting

with the defendants.  <u>See</u> <u>id.</u> at 32 (citing Fed. R. Civ. P.

8(c)).[10]  In ascertaining the effect of the mutual release on

Bourne's claims, the court looks to state law.  <u>See</u> <u>id.</u> at 33.

Ordinary principles of contract formation and interpretation

apply to releases.  <u>See</u> <u>Huguelet v. Allstate Ins. Co.</u>, 141 N.H.

777, 779 (1997).  In interpreting the contract, the court must

ascertain "the intention of the parties at the time it was

made[,]" by considering "the written agreement, all its

---

[10]Although release is an affirmative defense, under New
Hampshire law the burden of establishing a basis to avoid the
enforceability of a release resides with the party challenging
it.  <u>See</u> <u>Maltais v. Nat'l Grange Mut. Ins. Co.</u>, 118 N.H. 318, 320
(1978); <u>Schofield v. E.R. Bates & Co.</u>, 90 N.H. 31, 3 A.2d 818,
820 (1939).  The court notes, however, that the allocation of the
burden is not dispositive in this case.

provisions, its subject matter, the situation of the parties at the time it was entered into and the object intended." Commercial Union Assur. Co. v. Brown Co., 120 N.H. 620, 623 (1980).  The parol evidence rule, however, dictates that "absent fraud, duress, mutual mistake, or ambiguity, [the court] must restrict [its] search for the parties' intent to the words of the contract."  Parkhurst v. Gibson, 133 N.H. 57, 62 (1990). Contract interpretation is a legal question for the court. Huguelet, 141 N.H. at 779.

To invoke the release defense, the defendants must establish that the release "(1) applied to [defendants], (2) encompassed the claims asserted [in the present lawsuit], and (3) was legally enforceable."  Nottingham Partners, 925 F.2d at 32; cf. Barnes v. N.H. Karting Ass'n, Inc., 128 N.H. 102, 107 (1986) (noting, in the context of a negligence action, that the plaintiff's claims "must have been within the contemplation of the parties at the time of the execution of the agreement").

Bourne concedes that the first requirement is met.  He argues, however, that the release was not intended to encompass his present claims and that it is not legally enforceable.  The court considers the latter argument first because, if Bourne is correct, it would prevent the release from being applied to any of Bourne's claims.

Citing the six-factor "totality of the circumstances" test outlined by the First Circuit in <u>Melanson v. Browning-Ferris Indus., Inc.</u>, 281 F.3d 272, 276 n.4 (1st Cir. 2002),[11] Bourne argues that his execution of the release was not knowing or voluntary.  Although <u>Melanson</u> concerned the validity of a release of federal statutory rights, <u>see</u> <u>id.</u> at 274 (noting that a release of rights under Title VII is valid if it is "knowing and voluntary, as evidenced by the totality of the circumstances"), the New Hampshire Supreme Court has considered similar factors in actions seeking to rescind a release.  <u>See, e.g.</u>, <u>Webber v. Phipps</u>, 95 N.H. 1, 56 A.2d 538, 539-40 (1948); <u>Graham v. Weber</u>, 79 N.H. 393, 109 A. 717, 718 (1920).

Bourne argues that he lacked the business acumen to effectively negotiate the release because he was not educated beyond high school and he is a self-employed hardwood floor contractor.  He further argues that he had "essentially no role in drafting" the release, that the meaning of release was not clear to him, that he was not represented by counsel at the time

---

[11]"The six factors are: (1) plaintiff's education and business experience; (2) the respective roles of the employer and employee in . . . determining the provisions of the waiver; (3) the clarity of the agreement; (4) the time plaintiff had to study the agreement; (5) whether plaintiff had independent advice, such as that of counsel; and (6) the consideration for the waiver." 281 F.3d at 276 n.4.

he executed the release, and that the consideration was
inadequate because the defendants did not deliver on their
promises and later threatened criminal prosecution.  Bourne also
suggests that he executed the release under duress, claiming that
he and his wife were "under a tremendous amount of stress and
pressure from the Town to rescind the [revised waiver] and have
the action against them dropped."  Bourne Obj. at 22.

    The court finds no genuine issue of material fact as to the
validity of the release.  Bourne concedes that he has a high
school diploma and that he runs his own business.  As a self-
employed contractor, he presumably has some experience with
negotiating contracts.  Moreover, the fact that Bourne purchased
a fifty-acre parcel of land, which he apparently sought to
improve and to subdivide into lots, further undermines his self-
portrayal as a person unable to comprehend the terms of a mutual
release.  Cf. Caban Hernandez v. Philip Morris USA, Inc., 486
F.3d 1, 9 (1st Cir. 2007) (upholding the validity of an
employer's release where the plaintiffs all had high-school
diplomas and business experience).

    The plain language of the mutual release, which was fully
contained on one page in four sentences, was well within the
comprehension of a lay person.  Cf. Melanson, 281 F.3d at 277.
Bourne states that he "understood that the 'release' related only

to the claims asserted by the Town in the action it brought against me." First Bourne Aff. ¶ 28. Since the revised waiver was the subject of the town's lawsuit, Bourne's concession means that he understood that the mutual release waived any claim the <u>town</u> had concerning that agreement. The court rejects, as contradicted by the plain language of the release, Bourne's implausible assertion that he failed to comprehend that the <u>mutual</u> release also waived <u>his</u> claims pertaining to the revised waiver.

The fact that Bourne did not draft the release does not cut strongly in his favor given the lack of evidence establishing that the negotiations surrounding the release were one-sided. <u>See</u> <u>Caban Hernandez</u>, 486 F.3d at 9. Bourne's allegation that the town pressured him to sign the release without the advice of counsel also lacks support. Bourne concedes that his former attorney "had some communications with Town counsel regarding the alleged release," Bourne Obj. at 22, and the record establishes that Bourne had hired attorneys in relation to his tug-of-war with the town both before and after execution of the release. <u>See</u> <u>Melanson</u>, 281 F.3d at 278 (noting that the plaintiff "could have contacted the same attorney she had spoken to just months earlier" with respect to a related employment matter). Nor is there any evidence that the town rushed Bourne into signing the

release.  To the contrary, Bourne's affidavit suggests that any pressure was self-inflicted.  See First Bourne Aff. ¶ 27 ("[M]y wife and I were very anxious and stressed about the lawsuit the Town filed against us and so we hoped if we acted quickly on their proposal, the problems with the Town would be behind us."); see Goodwin R.R., Inc. v. State, 128 N.H. 595, 605 (1986) (finding of duress requires party challenging the contract to show, inter alia, "that the coercive circumstances were the result of the other party's acts, that the other party exerted pressure wrongfully, and that under the circumstances the party had no alternative but to accept the terms set out by the other party").

Finally, Bourne's argument concerning the failure of the town to provide adequate consideration is misplaced.  Bourne claims that Arruda made oral representations that the town would grant him a building permit and would relocate the public right-of-way to the perimeter of his property.  But these promises are not reflected in the written release agreement.  Even if Arruda's alleged oral statements are admissible under an exception to the parol evidence rule, see Goodwin, 128 N.H. at 605 (parol evidence admissible to establish consideration), Bourne's affidavit indicates that they pertained only to the second revised waiver, not to the mutual release agreement.  Bourne stated that Arruda

had told him that if he "'gave back' the 'waiver agreement' and
signed a new one, the Town would drop the lawsuit against [him],
grant [him] a building permit, and allow [him] to relocate the
alleged road/trail to the outside perimeter of [his] property
[subject to a public hearing on the relocation]."  First Bourne
Aff. ¶ 26.

     Viewing the record as a whole, including Bourne's affidavit,
it appears that Bourne and the town first negotiated a settlement
of the town's lawsuit.  It was during these negotiations that
Bourne alleges Arruda made the oral promise to relocate the
right-of-way.  Regardless of whether such a promise was made,
Bourne ultimately signed a new waiver agreement superseding the
old one.  With the exception of the promise to relocate the
right-of-way, the second revised waiver explicitly provided the
terms of the settlement agreement outlined above.  The town then
stipulated to dismissal of its lawsuit with prejudice and granted
a building permit to Bourne.

     The parties subsequently executed a mutual release whereby
both parties agreed to waive any claims they had against each
other arising from the town's lawsuit.  The mutual release was an
agreement reached separately from the settlement agreement, and
the consideration to each party of the release was simply the
purchase of "peace."  Such consideration is valid and was not

undermined when the county sheriff later investigated Bourne's accusations of forgery and the town's counter-accusation that Bourne's accusation was false.  Notably, it was Bourne, not the town, that caused the initiation of the criminal investigation. In any event, the release did not purport to immunize the parties from criminal liability, nor could it.

Therefore, the court concludes that there is no genuine issue of material fact as to the enforceability of the mutual release.  The Melanson factors overwhelmingly favor a finding that Bourne knowingly and voluntarily executed the release.  Cf. Caban Hernandez, 486 F.3d at 10 (affirming summary judgment based on the validity of the defendants' releases).  Accordingly, the court next considers the scope of the release and its effect on Bourne's specific claims.

### 3.  Scope of the Mutual Release

The release was written broadly to immunize both parties "from all claims arising out of" the town's lawsuit.  At a minimum, this language purports to extinguish any controversy at issue in the town's lawsuit.  The only apparent limit is the narrow carve-out allowing Bourne the right to challenge the legal status of Solomon Harmon Road.  Presumably, it was this exception

41

that allowed Bourne to bring the proceedings that are currently
pending in the superior court.

The release further explains that its purpose is "to buy
peace, [and] terminate all other disputes and further
litigation."  This language, which mirrors New Hampshire Supreme
Court precedent concerning releases, suggests that the object of
the mutual release was not simply to put an end to the existent
controversies, but also to bar future controversies respecting
the same set of operative facts.  See Huguelet, 141 N.H. at 779–
80 (distinguishing releases that purchase peace against future
controversy from releases that merely compensate for injuries);
Cogswell v. Boston & M.R.R., 78 N.H. 379, 101 A. 145, 147, 148
(1917) (holding that, because the purpose of the release was "to
terminate all dispute and litigation" between the parties, a
mutual mistake as to the extent of the plaintiff's injuries was
not a basis for rescinding the release).

The central focus of the town's lawsuit was the revised
waiver.  Three of Bourne's state law claims in this action
directly pertain to that agreement.  Bourne first claims that the
defendants breached the revised waiver by failing to provide him
with a building permit, by contesting the validity of the
agreement, and by filing a state lawsuit against Bourne seeking
to rescind the agreement.  Because the mutual release extends at

a minimum to controversies that were pertinent to the town's lawsuit, such as questions as to the validity or enforceability of the revised waiver, it bars Bourne's breach of contract action.  The terms of the settlement agreement, as manifested in the second revised waiver, also obviate any claims relating to the revised waiver.

Bourne next alleges that the defendants fraudulently represented to him that the Solomon Harmon Road is a class VI road knowing that it was not.  He also claims that the selectmen forged, or caused the forgery, of his signature on a phony cover letter in an attempt to strengthen the town's argument in favor of rescission of the revised waiver.  As a result of these deliberate misrepresentations, Bourne argues, he agreed to rescission of the revised waiver.

As described above, the mutual release extinguished any disputes that were pending between Bourne and the town at the time the town's lawsuit was settled.  Bourne's allegation that the defendants forged the cover letter parallels his petition in the town's lawsuit that argued that the town had manipulated the cover letter.  Thus, to the extent Bourne's fraud claim is based on the allegedly forged cover letter, it is barred by the mutual release.  To the extent that Bourne claims that the release was itself fraudulently induced, or that the town continued to make

fraudulent representations after settlement of the 2003 lawsuit, the record does not support such claims.

To establish fraud, Bourne must prove "that the defendant[s] made a representation with knowledge of its falsity or with conscious indifference to its truth with the intention to cause another to rely upon it[,]" and that he, in fact, justifiably relied on that misrepresentation.  <u>Snierson v. Scruton</u>, 145 N.H. 73, 77 (N.H. 2000).  Fraud is never presumed; it "must be established by clear and convincing proof, not 'implied from doubtful circumstances which merely awaken suspicion.'"  <u>Brochu v. Ortho Pharm. Corp.</u>, 642 F.2d 652, 662 (1st Cir. 1981) (quoting <u>Lampesis v. Comolli</u>, 101 N.H. 279, 283 (1958)).

As described above, however, the court has already determined that Bourne's forensic document examiner is not qualified to testify as to the origin of the document containing the alleged forgery.  <u>See</u> <u>supra</u> at 21-22.  Thus, even if Bourne could establish that the signature on the disputed cover letter is a forgery, he has not presented convincing evidence establishing that it originated from the defendants.  Similarly, regardless of the bona fide legal status of the Solomon Harmon Road, Bourne has not presented evidence establishing that the defendants knowingly misrepresented the legal status of the road. Rather, the record establishes that the defendants relied on the

44

1998 Madison Class VI Road Study Committee report identifying Solomon Harmon Road as a class VI road.

Bourne's third state law claim is that the Madison selectmen, Arruda, Graves, and Crafts, negligently misrepresented their assent to the revised waiver by signing, notarizing, and recording it without reading it or showing it to town counsel. In reliance on the town's apparent acceptance of the terms of the revised waiver, Bourne argues, he completed the purchase of the fifty acres in Madison.  Bourne also alleges that the defendants on several occasions negligently misrepresented that the Solomon Harmon Road is a class VI road.

The court finds that these claims are also barred by the mutual release.  As explained above, the revised waiver, and the circumstances under which it was executed, were directly at issue in the town's lawsuit.  Although Bourne did not allege a claim of negligent misrepresentation during the course of the town's lawsuit, the claim arises from the same set of operative facts that were in dispute in that lawsuit.  Accordingly, the court finds that this claim was within the contemplation of the parties at the time they executed the mutual release.

Lastly, Bourne claims that the defendants tortiously interfered with his attempts to improve his property.  To prevail on a claim for tortious interference with contractual relations,

Bourne must prove that (1) he had an economic relationship with a third party, (2) the defendants knew of this relationship, (3) the defendants intentionally and improperly interfered with this relationship, and (4) Bourne was damaged by such interference. Hughes v. N.H. Div. of Aeronautics, 152 N.H. 30, 40-41 (2005) (citing Demetracopoulos v. Wilson, 138 N.H. 371, 373-74 (1994)).

This claim concerns Bourne's attempts to hire a contractor to lay crushed stone and gravel on Solomon Harmon Road and to connect his property to the electrical grid.  In December 2003, the Madison chief of police ordered Bourne's contractor to cease work on the road because he was not using the grade of gravel required for a public road.  The following spring, Bourne received inconsistent communications from town counsel concerning his proposal to make repairs to the road.  First, town counsel represented that the selectmen had approved Bourne's proposal, but later that same day, he represented that the selectmen had voted not to approve it.

In May 2004, the town ordered the New Hampshire Electrical Cooperative to cease installation of power lines along Solomon Harmon Road until obtaining the necessary pole setting permits. Bourne does not dispute the town's basis for halting the work, but alleges that the town wrongfully delayed issuance of a "conditional license" that would have allowed the Electrical

Cooperative to finish its work pending acquisition of the permits.  Because Bourne believed that the town would not grant a conditional license, he paid his neighbor for an easement over his property on which to run the power lines.  Bourne acknowledges that, months later, on the day he completed purchase of the easement, the town issued the conditional license.

The defendants do not explicitly argue that the mutual release bars these claims.  Because the facts surrounding these claims occurred after the parties executed the mutual release, and these claims do not directly concern the revised waiver, the mutual release does not bar them.  Nevertheless, the defendants argue that this "matter is subsumed by the state court litigation, and the superior court has directly addressed this issue."  Defendants' Supp. Mem. at 15.  The defendants argue that the Rooker-Feldman doctrine precludes this claim because the superior court has already ruled that the town's actions were lawful.  See Rooker v. Fid. Trust Co., 263 U.S. 413 (1923); D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983).

Rooker-Feldman only applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 125 S. Ct. 1517,

47

1521–22 (2005).  As explained in a previous ruling, the <u>Rooker–</u>
<u>Feldman</u> doctrine cannot apply here because the state proceedings
had not "ended" before Bourne filed his federal lawsuit.  <u>See</u>
Order of May 9, 2006 (document no. 95) (citing <u>Federacion De</u>
<u>Maestros De P.R. v. Junta De Relaciones Del Trabajo De P.R.</u>, 410
F.3d 17, 24–27 (1st Cir. 2005)).  In fact, the state proceedings
are still pending.

The defendants have not presented any alternative argument
for granting summary judgment on this claim.  To be sure, a
ruling by the superior court is likely to answer the question of
whether the defendants had the authority to prevent Bourne from
making improvements to the road.  If the defendants prevail in
the state case, they can argue the doctrine of collateral
estoppel mandates a finding that the defendants' interference was
not improper.  But the superior court has not yet ruled, and
lacking any developed argumentation on this claim, the court will
not grant summary judgment.

### III.  Conclusion

Consistent with the above, the defendants' motion to dismiss
or to stay proceedings (document no. 76) is granted to the extent
of the parties' agreement as outlined by this court in its May 3,
2007 order (document no. 93), and in all other respects it is

48

denied.  The defendants' motion for summary judgment (document no. 25) is denied as to the plaintiff's claim of tortious interference with contractual relations, but is granted in all other respects.

The parties are reminded that they shall promptly notify the court when the Carroll County Superior Court has issued its ruling in the related state action.  Further, the parties would be well advised to review their positions in light of the court's ruling on the summary judgment motion and make a good faith effort to resolve this case promptly.

SO ORDERED.


_____
Joseph A. DiClerico, Jr.
United States District Judge

June 29, 2007

cc:  Catherine M. Costanzo, Esquire
     Brian J.S. Cullen, Esquire
     Rachel A. Hampe, Esquire
     Richard D. Sager, Esquire
     Gerald F. Williamson, Esquire

49