UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Samuel J. Bourne

     v.                         Civil No. 05-cv-365-JD

Town of Madison, et al.


O R D E R


     Samuel J. Bourne, who is proceeding pro se, brought federal
and state claims against the Town of Madison, its selectmen, and
a resident of Madison, challenging their actions in regard to
property he owns in Madison and a right-of-way that runs across
his property.  Through motion practice, all but one of the claims
have been resolved against Bourne, leaving his claim for
intentional interference with contractual relations.  Bourne and
the defendants each move for summary judgment on that claim and
each opposes the other's motion.[1]

_____

     [1]The defendants argue in part that Bourne's motion for
summary judgment is untimely.  Under the scheduling order, as
amended by the defendants' assented-to motion, motions for
summary judgment were due before October 21, 2006.  However, both
the plaintiff and defendants now contend that the single
remaining claim in this case can be resolved through summary
judgment.  Therefore, before the court and the parties commit the
resources necessary for a trial, it is prudent to consider
motions for summary judgment.

Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  A party opposing a properly supported motion for summary judgment must present competent evidence of record that shows a genuine issue for trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  All reasonable inferences and all credibility issues are resolved in favor of the nonmoving party. See id. at 255.

When parties file cross-motions for summary judgment, the court must consider the motions separately to determine whether summary judgment may be entered under the Rule 56 standard.  Pac. Ins. Co., Ltd. v. Eaton Vance Mgmt., 369 F.3d 584, 588 (1st Cir. 2004); Bienkowski v. Northeastern Univ., 285 F.3d 138, 140 (1st Cir. 2002).  In assessing the motions, the court must determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).

I.  <u>Properly Supported Motion for Summary Judgment</u>

The defendants challenge the factual basis Bourne provided to support his motion for summary judgment.  Instead of filing an affidavit to support the factual statements in his motion, Bourne attempted to verify the entire nineteen-page motion with the following statement, known as a jurat:  "Respectfully Submitted, under oath and under the pains of perjury that each and every detail stated within this motion for Summary Judgment is believed to be the truth and nothing but the truth."  Bourne signed and dated his motion following that statement.

To support a motion for summary judgment, an affidavit must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(e)(1).  "This 'requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise.'"  <u>Livick v. Gillette Co.</u>, 524 F.3d 24, 28 (1st Cir. 2008) (quoting <u>Perez v. Volvo Car Corp.</u>, 247 F.3d 303, 316 (1st Cir. 2001)).  Personal knowledge, for purposes of an affidavit, cannot be based on a belief that certain things are true.  <u>See, e.g.</u>, <u>Quinones v. Buick</u>, 436 F.3d 284, 291 (1st Cir. 2006); <u>Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals</u>, 297 F.3d 14, 24 n.4 (1st Cir. 2002); <u>Perez</u>, 247 F.3d at 315.

Therefore, because Bourne's jurat states only that he believes the facts in his motion are true, it is ineffective to convert the motion to an affidavit for purposes of summary judgment.  Under the local rules of this district, "[a] memorandum in support of a summary judgment motion shall incorporate a short and concise statement of material facts, supported by appropriate record citations, as to which the moving party contends there is no genuine issue to be tried."[2]  LR 7.2(a)(1).  Although Bourne attempted to cure the deficiency of the motion jurat in his reply, even if the jurat used in the reply met the requirements of Rule 56(e), a reply cannot be substituted for the motion.[3]

To the extent the facts Bourne states in the "Background" section of his motion are properly supported by citations to the record, those facts will be considered for the purpose of

---

[2]Bourne did not file a memorandum, as required by Local Rule 7.1(a)(2), or incorporate a statement of material facts, as required by Local Rule 7.2(a)(1), with his motion for summary judgment.

[3]Bourne concluded his reply with the statement: "Respectfully Submitted, under oath and under the pains of perjury that each and every detail stated within this reply to defendant's objection to Plaintiff's motion for summary judgment is based on personal knowledge and believed to be the truth and nothing but the truth."  Bourne's reply, however, does not meet the personal knowledge requirement because it is rife with statements of his opinion, conclusions, and assumptions.

4

deciding his motion.  Facts stated in the motion that are not
properly supported will not be considered.  Bourne used the same
jurat in signing his objection to the defendants' motion for
summary judgment that he used in his reply.  The defendants did
not challenge Bourne's attempt to convert his objection to an
affidavit.  In the absence of an objection from the opposing
party, any inadequacy in the jurat is waived for purposes of the
pending motion for summary judgment.  See Desrosiers v. Hartford
Life & Accident Co., 515 F.3d 87, 91 (1st Cir. 2008).


II.  Background[4]

        In 2002, Bourne, a resident of Massachusetts, bought a
fifty-acre parcel of land, with a small cabin, in Madison, New
Hampshire, which parcel abuts a large tract of conservation land
where the town permitted snowmobile use.  Access to the cabin was
provided over a roadway known as Solomon Harmon Road, which at
that time the town considered to be a Class VI highway under
state law.  Before Bourne bought the property, the town had
adopted a regulation that allowed snowmobiles to use certain
Class VI roads.  The dispute that arose between Bourne, the town,

        [4]The background information is taken from the factual
statement included in the order dated June 29, 2007, and the
parties' properly supported facts, submitted in support of the
motions and objections.

and Bourne's neighbors was due, at least in part, to Bourne's efforts to bar the public from using Solomon Harmon Road for snowmobiling.

In November of 2002, Bourne hired the New Hampshire Electric Co-op to construct electric lines to the cabin on his property with an estimated cost of $6,662. Problems developed between Bourne and the town about the installation of poles and electric lines along Solomon Harmon Road. In addition, a dispute arose between Bourne and his neighbors, the Cyrs, about the use of Solomon Harmon Road.

A. <u>Dispute with the Cyrs</u>

In late 2002, the Cyrs filed an action in state court seeking injunctive relief to protect their use of that part of Solomon Harmon Road which ran over Bourne's property. In his answer, Bourne charged that the Cyrs had blocked New Hampshire Electric Co-Op from beginning pole installation along the roadway. Bourne also filed suit against the Cyrs in state court, alleging interference with his use of the roadway.

On May 7, 2003, the state court found that the Cyrs had satisfied their burden for the issuance of a preliminary injunction to enjoin Bourne "from obstructing in any way the use of the subject right-of-way by the Petitioners. Neither party

6

shall cut trees or modify the said right-of-way in any way without prior Court approval." The court also ordered that the Cyrs did not have the right to delegate use of the right-of-way to anyone other than their immediate family for the use of a "mechanized vehicle" and that all use was limited to the "'marked trail.'" A few months later, the state court ordered, pursuant to an agreement reached between the parties:

> that [Bourne] may cause to be installed an electrical pole(s), anchors, and wires to service his property. Said electrical pole(s), anchors, and wires shall be placed <u>only</u> within the subject 30-foot right-of-way and shall not obstruct the use of same. Further, in installing said electrical pole(s), anchors, and wires trimming of the trees, regardless of their location, will be allowed. No tree shall be destroyed and or [sic] removed.

<u>Cyr v. Bourne</u>, 02-E-130 (N.H. Superior Ct. Sept. 15, 2003).

On November 6, 2003, the state court approved an agreement between the Cyrs and Bourne which provided that the access road to Bourne's property was a Class VI highway, known as Solomon Harmon Road; that under Bourne's agreement with the town, Bourne was responsible for maintenance of the road; that Bourne would be allowed to repair the road "with oversight by the Madison Selectmen"; that before making necessary repairs, Bourne must meet with the selectmen to gain approval for his proposed repairs; that notice of the repairs would be provided to the Cyrs; and that after the road was repaired, Bourne would be

7

"permitted to snow plow and sand the said roadway in the normal
and customary manner."

     An inspection of the road area was done on November 18,
2003, by a group that included the superior court judge.
Following a meeting of the selectmen, town counsel sent a letter
to Bourne's counsel on November 19, 2003, which detailed the
actions the selectmen had approved for the road.  The letter
confirmed that Solomon Harmon Road was a Class VI road, stated
its location and required Bourne to agree to that location, and
stated that Bourne was required to provide a survey of the road
before any permanent improvements were made.  The letter further
provided that if the stated conditions were met, Bourne would be
allowed to make temporary improvements to the road by filling
ruts and spreading "one and a half inch crushed bank run gravel"
but would not be allowed to cut or remove trees within the road's
right-of-way or spread or use any of the stone that was then
piled on Bourne's property.  With respect to permanent
improvements to the road, Bourne was required to make a written
proposal with certain specifications to the Board of Selectmen.
The letter also stated that the selectmen had agreed to accept,
review, and approve Bourne's application for installing utilities
within the right-of-way for Solomon Harmon Road.  The letter
summarized the remaining issues to be resolved with Bourne and

addressed the current use status of the property and improvements Bourne had made to the cabin without a building permit.

During the fall of 2003, Bourne hired Richard Verrochi to repair the road.  In early December, 2003, Verrochi used crushed stone, topped with bank run crushed gravel, to fill ruts and to cover the road, contrary to the directions given by the town for repair work on the road.  The Madison police chief ordered Verrochi to stop all repair work on the road.

In January of 2004, the superior court issued a decision in consolidated cases Cyr v. Bourne, 02-E-130, and Bedrock Realty Trust v. Cyr, 03-E-120, allowing Bourne to maintain the right-of-way during the winter by plowing and lightly sanding the surface, as provided in the parties' agreement that had been approved by the court in November of 2003.  The order prohibited Bourne from putting down "heavy levels of gravel and crushed stone" and from obstructing the Cyrs' use of the right-of-way.  The court granted Bourne's motion to remove timber within the right-of-way conditioned on Bourne showing a purchase and sale agreement for the modular home that he represented he was buying and on Bourne hiring a professional tree removal service to do the work.

In the same order, the superior court held that Bourne was in willful contempt of the court's previous orders (issued on May 6, 2003, and November 6, 2003) pertaining to improvements to

9

Solomon Harmon Road.  The court ordered Bourne to remove all stone that he had caused to be spread on the right-of-way and to comply with all of the terms of the court's previous orders.  The court also awarded attorneys' fees to the Cyrs, concluding that Bourne's oppressive, vexatious, arbitrary, capricious, or bad faith conduct had begun or unnecessarily prolonged the litigation and that the Cyrs had been forced to litigate when Bourne's position was patently unreasonable.  The court granted the Cyrs' motion to dismiss Bourne's suit, 03-E-120.

A hearing was held in Cyr v. Bourne, 02-E-130, on May 3, 2005.  At the hearing, Bourne offered the testimony of Larry Martin, who worked for the New Hampshire Electric Co-op.  Martin testified that the town police chief ordered his crew to stop work along Solomon Harmon Road, where they were cutting trees in preparation for installing utility poles, and that Roger Cyr was present when that occurred.  During a deposition, Selectman Graves testified that the selectmen told the police chief to stop the work on Solomon Harmon Road.

On May 18, 2006, Bourne and the Cyrs entered a stipulation concerning work to be done on the roadway.[5]  The Cyrs agreed to

_____

[5]Bourne represents that the litigation with the Cyrs ended in a settlement, after the court ruled that the Cyrs did not have deeded rights to the roadway over Bourne's property, and that the Cyrs paid Bourne $8,450 as part of the settlement.  Bourne did

allow Bourne to cut several marked trees within the roadway
easement for purposes of installing electric poles and lines.
They also agreed that the power lines would be erected on the
easement Bourne obtained from another neighbor, Davis, not on
Solomon Harmon Road.  Bourne also agreed that the Cyrs could cut
trees necessary to install underground power lines to their
house.

    B.  <u>Dispute with the Town</u>

    During the same period, Bourne sought a building permit for
his property.  The town required Bourne to sign a waiver
agreement to relieve the town of maintenance and liability with
respect to Solomon Harmon Road.  The town faxed a standard form
agreement to Bourne, which Bourne sent to his attorney.  Bourne's
attorney revised the agreement, adding provisions that the town
could not use the part of Solomon Harmon Road that crossed
Bourne's property and that the town would not reclassify the road
without Bourne's consent.  Bourne signed the revised waiver and
sent it back to the town.  The town recorded the revised waiver
without reading it.

    Once the waiver form was recorded, Bourne erected a chain

---

not file any evidence to support his statement.

across Solomon Harmon Road at the entrance to his property.   The
Madison code enforcement officer removed the chain.   In November
of 2002, Bourne hired a contractor to build a gate across the
road.   The code enforcement officer informed the contractor that
the town would remove the gate if it were constructed.   The town
removed the gate on December 4, 2002.

Selectman John Arruda discovered that the recorded waiver
form was not the standard form and sent Bourne a letter stating
that the waiver was, therefore, invalid because the selectmen
lacked authority to restrict public access to a town road without
first convening a town meeting to consider the issue.   Arruda
told Bourne that if he wanted a building permit it would be in
his best interest to sign the standard waiver which Arruda
attached to the letter.   A dispute arose between Bourne and the
town about whether Bourne's cover letter, which accompanied the
revised waiver, notified the town that the provisions of the
waiver had been changed.

On November 11, 2002, Robert King, a resident of Madison who
had served on the Class VI Road Study Committee in 1998, sent a
memorandum to the selectmen about granting building permits for
property on Solomon Harmon Road.   King advised that the waiver
Bourne signed was invalid, that a new agreement should be signed
and recorded, and that the town's defense to a suit brought by

Bourne should be that the selectmen did not add the provisions
that invalidated the waiver.  The code enforcement officer denied
Bourne's request for a building permit on November 12, 2002.

     The town filed suit on January 10, 2003, in state court,
seeking rescission of the recorded revised waiver and an
injunction to prevent Bourne from interfering with the public's
use of Solomon Harmon Road.  Bourne filed a petition, also in
state court, accusing the town of forging the cover letter that
it represented it had received with the revised waiver and asking
the court to uphold the waiver and to order the town to issue
Bourne a building permit.  Before a ruling in the town's case,
Arruda offered a settlement that if Bourne signed a new waiver,
the town would drop its suit and issue a building permit.[6]  The
case was settled in May of 2003.  Bourne signed a new waiver; the
parties signed a release; and the town issued Bourne a building
permit on May 7, 2003.[7]  The town's suit was dismissed.

     Bourne filed four suits against the town.  In the three

_____

     [6]Bourne remembered that the town also offered to relocate
the public trail, after a hearing, so that use of the trail would
not interfere with Bourne's use and enjoyment of his property.

     [7]The record shows that in a letter dated February 6, 2004,
the town code enforcement officer notified Bourne that his
building permit was revoked due to his failure to meet the
condition that the land area for building had to be taken out of
current use designation.

13

suits filed in 2003, Bourne sought relocation and widening of the roadway (03-E-061), removal of the road's Class VI status (03-E-114), and injunctive relief to prohibit the town from allowing snowmobiles and other vehicle use of the road (03-E-144).  Later, on February 24, 2005, Bourne appealed the decision of the selectmen to lay out Solomon Harmon Road as a Class VI road (05-E-014).  All four suits were eventually consolidated.

Following a hearing before the selectmen, the town denied Bourne's petition to relocate Solomon Harmon Road to a location at the perimeter of his property, concluding that it would be contrary to the public interest to locate the public trail at a place away from the recorded easement.  In October of 2003, the town denied Bourne's request to subdivide his property into four lots due to the inadequacy of the access road.  Bourne had the right-of-way area surveyed, which was completed on April 28, 2004.

At a selectmen's meeting on November 18, 2003, Bourne raised the subject of erecting electrical poles along Solomon Harmon Road.  The meeting notes state that Bourne's counsel would submit a proposal for that project.  A letter from town counsel to Bourne's counsel, sent on November 19, 2003, summarized the issues that then existed between the town and Bourne.  The letter stated, among other things, that before the selectmen would

14

approve improvements to Solomon Harmon Road, Bourne would have to
provide a survey of the road by a licensed surveyor.  Once a
survey was obtained, Bourne would be permitted to make temporary
improvements to the road by filling in ruts and spreading "one
and a half inch crushed bank run gravel."  Bourne was prohibited
from removing trees or using the stone located on his property on
the road.

In Bedrock Realty Trust [Bourne] v. Town of Madison, 03-E-
144 (N.H. Superior Ct. November 25, 2003), the court granted in
part and denied in part Bourne's request for temporary injunctive
relief.  The court imposed "temporary provisions" on the parties
"pending final resolution" of the case.  The court ordered Bourne
not to "interfere with or limit the public use or access to the
so-called Solomon Harmon roadway in any way; nor shall the [town]
interfere with the reasonable use of Lot 19 by [Bourne]."  Id.
The remainder of the order pertained to the town's obligations
with respect to Solomon Harmon Road for public snowmobile use.

After the winter of 2003 to 2004, Bourne hired Hanson
Excavation to repair the roadway and to make improvements that
were necessary before electrical poles could be installed.  In a
letter to Bourne's counsel, dated April 14, 2004, town counsel
stated that the selectmen had reviewed the proposed construction
but voted not to approve it.  The letter stated that if Hanson

15

submitted a new proposal that did not include cutting trees the selectmen would consider it.  The letter also advised Bourne's counsel about the procedure for submitting a request for current use assessment.

In May of 2004, the New Hampshire Electric Co-op submitted a revised pole plan, with an estimated cost of $9,753, and also notified Bourne that the selectmen had informed the Co-op that the location of the Class VI road was being surveyed and that the Co-op would have to obtain pole setting permits before beginning work.  Counsel for the town notified Bourne's attorney about a letter Bourne sent to the selectmen and explained that the selectmen were reluctant to approve the repairs Bourne proposed because of the "liberties" Bourne had taken in the past and because the survey was not complete.  Counsel also stated that the selectmen had driven on the road and found that it was passable in its current condition.

On October 19, 2004, Bourne submitted a memorandum to the selectmen addressing a variety of issues.  He stated that the access road needed repair before the first snow in order to permit access during the winter, that the New Hampshire Electric Co-op notified Bourne that the town was preventing them from installing power lines to Bourne's property, and that he should be issued a building permit immediately.  During a deposition

taken in this case, Selectman Graves testified that the selectmen told the chief of police to stop the electrical service work on Solomon Harmon Road.

On April 25, 2006, Bourne purchased an easement from another neighbor, David Davis, to allow electrical service to be brought from the street to Bourne's house.  The new easement ran along Solomon Harmon Road.  The same day, the selectmen granted the New Hampshire Electric Co-op a license to install electric service under the plan submitted the year before.  A construction estimate, dated April 7, 2006, to install electric service to Bourne's property totaled $22,967.05.

Bourne filed suit in this court on October 17, 2005, alleging federal civil rights claims and state law claims against the town; selectmen Arruda, Graves, and Crafts; and Robert D. King.  The state court litigation continued at the same time.  On June 29, 2007, the court granted summary judgment in favor of the defendants on all of Bourne's claims except his claim of intentional interference with contractual relations.  The state court actions continued.  The court also granted the parties a limited opportunity to move for reconsideration of that order based on the outcome in the state court litigation.

A bench trial was held in state court in March of 2007 on the consolidated cases brought by Bourne against the town.  On

17

August 10, 2008, the superior court ruled that it lacked
authority to relocate the Kelsey Easement (which provided the
right-of-way known as Solomon Harmon Road) to a different place
on Bourne's property, that the Kelsey Easement prohibited public
use of snowmobiles and other mechanized vehicles (with limited
exceptions); and that the town had not shown the existence of
Solomon Harmon Road by prescription or an occasion to lay out
Solomon Harmon Road as a Class VI road.  The superior court
denied Bourne's request for attorneys' fees, stating:  "Although
the Town did not prevail on any of the issues presented, the
court finds the town did not conduct itself or respond to this
litigation in a manner warranting attorneys' fees." Bedrock
Realty Trust v. Town of Madison, 03-E-0061, 03-E-0114, 03-E-0114,
05-E-0014, at *17-*18 (N.H. Superior Ct. Aug. 10, 2008).

Bourne moved for an award of damages and for a hearing.  On
June 30, 2008, the superior court awarded Bourne $698 in damages
for the cost of reinstalling his gate but denied his request for
other damages because those claims were not "sufficiently
causally related to the injunction previously issued by the
court."  The court concluded that a hearing was not warranted.
The court also noted that Bourne's request for damages caused by
the injunctions could not be granted because he failed to request
an injunction bond.

Bourne appealed the superior court's decision to deny his request for an award of fees and for damages, and the town appealed the superior court's determination that the easement was not a Class VI highway.  The New Hampshire Supreme Court reiterated the superior court's holding that the town had "no right to allow public snowmobile access to [Bourne's property] pursuant to an easement granted to the town by [Bourne's] predecessor (easement) or a Class VI prescriptive highway, and that the town had no 'occasion' to lay out a portion of the road approaching the property . . . ."  Bedrock Realty Tr. v. Madison, Case No. 2008-0550, at *1 (N.H. Supreme Ct. May 14, 2009).  The supreme court affirmed the superior court's ruling that the easement was not a Class VI highway.

The supreme court also affirmed the superior court's decision not to award attorneys' fees, rejecting Bourne's argument that he had a "'clearly defined' right to preclude public snowmobile access to [his] property that should not have required litigation."  Id. at *2.  The supreme court concluded that the record did not show "that the litigation was instituted or unnecessarily prolonged through the town's oppressive, vexatious, arbitrary, capricious or bad faith conduct, or that the town's position was patently unreasonable."  Id. (internal quotation marks omitted).  The court further stated:  "While the

19

town's position as to the existence of a Class VI highway may not have been persuasive, it was not so lacking in evidentiary support as to have entitled [Bourne] to attorney's fees." Id. at *3.

With respect to Bourne's request for a hearing and for damages, the Supreme Court vacated the award of $698. The court concluded that Bourne's failure to request an injunction bond precluded an award of damages arising from the injunctions. The court also concluded that Bourne was not entitled to a hearing on his claims for damages and for an award of attorneys' fees.

After the New Hampshire Supreme Court issued its decision, Bourne moved for reconsideration in this court of this court's decision granting summary judgment in the defendants' favor on his claims except for his claim of intentional interference with contract. His motion was denied. His subsequent motions for reconsideration and for relief from judgment were also denied.

III.   <u>Bourne's Motion for Summary Judgment</u>

In support of his claim for intentional interference with contract, Bourne alleges:  "Defendants Board of Selectmen, John R. Arruda, Jr., Clifford A. Graves, and Eileen T. Crafts wrongfully interfered with the installation of electrical power service and road maintenance being performed by contract by Plaintiff and third parties (viz. New Hampshire Electric Cooperative and various road maintenance contractors)[.]"  2d Am. Compl. ¶ 70.  The claim against Crafts has been dismissed voluntarily, leaving the town, Arruda, and Graves as defendants.

Bourne contends that he is entitled to summary judgment on his claim against the town, Arruda, and Graves for intentional interference with contract.  The defendants object, asserting that Bourne cannot show that their interference with maintenance of the roadway was improper and that he cannot show that they caused any damages with respect to interference with utility service because of the interplay between the <u>Cyr</u> litigation and the town's actions.[8]

_____

[8]Bourne urges the court to ignore the defendants' references to the <u>Cyr</u> litigation, arguing that "the defendant's [sic] are attempting to confuse the court with issues of a non-party Roger Cyr's interference with the Plaintiff's deeded rights, in order to side track the Court's attention from the defendant's [sic] outrageous conduct."  Bourne, however, also discusses and provides evidence of his disputes and litigation with the Cyrs. Therefore, Bourne provides no persuasive ground for ignoring the

When the party with the burden of proof moves for summary
judgment, the moving party "must provide evidence sufficient for
the court to hold that no reasonable trier of fact could find
other than in its favor."  Am. Steel Fabricators, Inc. v. Local
Union No. 7, 536 F.3d 68, 75 (1st Cir. 2008).  A claim for
intentional interference with contractual relations requires
proof of the following elements:  "'(1) the plaintiff had an
economic relationship with a third party; (2) the defendant knew
of this relationship; (3) the defendant intentionally and
improperly interfered with this relationship; and (4) the
plaintiff was damaged by such interference.'"  Singer Asset
Finance Co., LLC v. Wyner, 156 N.H. 468, 478 (2007) (quoting
Hughes v. N.H. Div. of Aeronautics, 152 N.H. 30, 40-41 (2005)).

Bourne provides evidence showing that at the time in
question he claimed as his property the right-of-way then known
as Solomon Harmon Road.  Bourne also provides evidence that he
contracted with the New Hampshire Electric Co-op to install
electric service along the roadway to his property and with
contractors to repair the roadway.  Evidence also supports
Bourne's charge that the town knew of his plans to install
electric service and to make repairs to the roadway and acted to

⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

circumstances that involved the Cyrs.

22

stop or limit Bourne's plans.  The defendants object, contending that Bourne cannot show that their interference with repairs and improvements to the right-of-way was improper or that their actions caused his damages with respect to the delay in installing electrical service to his property.

    A.  <u>Interference with Road Maintenance and Improvement</u>

Only improper interference with contractual relations is actionable under New Hampshire law.  <u>Tsiatsios v. Anheuser-Busch, Inc.</u>, 2009 WL 114557, at *5 (D.N.H. Jan. 16, 2009).  Factors to be considered in determining whether an actor's interference is improper are:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's
>      conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of
>      action of the actor and the contractual interests of
>      the other,
> (f) the proximity or remoteness of the actor's conduct
>      to the interference and
> (g) the relations between the parties.

<u>Roberts v. Gen. Motors Corp.</u>, 138 N.H. 532, 540-41 (1994) (quoting <u>Restatement (Second) of Torts</u>, § 767 (1977)).  In contrast, conveying truthful information and honest advice to a third person do not constitute improper interference with contractual relations, and, further, actions taken in good faith

23

to protect a party's own legitimate interests are not improper
interference.  <u>Tsiatsios</u>, 2009 WL 114557, at *5 (citing
<u>Restatement (Second) of Torts</u> § 772, cmt. b and § 773 (1979));
<u>see also</u> <u>Roberts</u>, 138 N.H. at 541.

    Bourne contends that the defendants' actions in interfering
with repairs to the roadway were improper because the town did
not have a legal right to control the roadway.  Bourne relies on
the state court's subsequent conclusion that Solomon Harmon Road
was not a Class VI highway, that the town did not show that it
was a highway by prescriptive use or due to an "occasion" to lay
out the road, and that the town's easement along the road did not
include the use of snowmobiles.  The state court also concluded
that the record pertaining to the status of the right-of-way was
sufficiently ambiguous that Bourne did not have a clearly defined
right to exclude snowmobile access to the roadway and that the
town did not begin or prolong the litigation through "oppressive,
vexatious, arbitrary, capricious or bad faith conduct."  <u>Bedrock</u>
<u>Realty Trust v. Madison</u>, Case No. 2008-0550 (N.H. Supreme Ct. May
14, 2009).

    At the time in question, therefore, from 2002 through 2006,
the town could have believed, reasonably, that the roadway was a
Class VI highway, giving the town authority to control access and
work done to the road.  Indeed, Bourne agreed in the settlement

reached with the town in May of 2003, that Solomon Harmon Road
was a Class VI highway.  Further, the superior court's orders
pertaining to maintenance of the road in the context of the
litigation with the Cyrs justified the town's actions taken in
accord with the orders.

Bourne's suspicions, assumptions, and surmise about
malfeasance by the defendants do not provide evidence of an
improper purpose to support summary judgment in his favor.  In
addition, the state court's rulings about the status of Solomon
Harmon Road do not support Bourne's theory that the defendants
acted improperly in their earlier dealings with him while the
town believed that it had the authority to control the road.

B.   Interference with Installation of Electric Service

Bourne contends that the defendants' interference with the
installation of electric service to his property delayed the
project which resulted in higher costs.  The defendants argue
that because the installation of the electric utility service was
delayed by the litigation between the Cyrs and Bourne, any
interference by the town during that period did not cause
Bourne's damages.

As Bourne points out, the superior court ordered in
September of 2003 that pursuant to the agreement between the Cyrs

25

and Bourne that Bourne could "cause to be installed an electrical pole(s), anchors, and wires to service his property.  Said electrical poles(s), anchors, and wires shall be placed <u>only</u> within the subject 30-foot right-of-way and shall not obstruct the use of same."  02-E-130 (Sept. 15, 2003) at *2.  In January of 2004, however, in the litigation between Bourne and the Cyrs, the court addressed maintenance of the roadway for winter travel, clearing trees along the roadway to allow delivery of a modular home, and Bourne's contempt of prior orders pertaining to road maintenance.  The superior court issued an order on the same day, January 15, 2004, in the consolidated cases Bourne brought against the town, and granted the town's motion for preliminary injunctive relief, enjoining Bourne from "making any improvements in the Solomon Harmon Road except in accordance with the provisions as provided in the letter (dated 11/19/03) . . . ." <u>Bedrock Realty Trust</u>, 03-E-120 (January 15, 2004).  The record shows that road improvements, including cutting trees, was necessary for electrical service installation.

As presented by Bourne in support of his motion for summary judgment, the record leaves factual issues as to whether the town's actions or the Cyrs' actions caused the delay in installing electrical service.  Therefore, the record Bourne provides does not support summary judgment in his favor.

26

IV.  Defendants' Motion for Summary Judgment

As in their opposition to Bourne's motion for summary judgment, the defendants argue that Bourne cannot show that their interference with his road maintenance and improvement efforts was improper and that he cannot prove that the defendants caused his damages with respect to the delay in installing electrical service.[9]  In response, Bourne again accuses the defendants of false representations, harassment, forgery, frivolous litigation, fraud on the court, and "outrageous abuse."  Bourne challenges the superior court's decisions related to maintenance of Solomon Harmon Road.  He also contends that the Cyr litigation did not delay the electrical service installation.

A.  Road Maintenance Work

The defendants show that their actions in preventing Bourne from doing certain work on the right-of-way, then known as Solomon Harmon Road, were reasonable, based on their belief that it was a Class VI highway and on the superior court's orders. Bourne's disagreement with the superior court's orders does not undermine their import.  The state courts' later decisions which

---

[9]To the extent the defendants argue that Bourne's claim for damages due to improper interference with contract is barred by Bourne's failure to obtain an injunction bond, that argument is not sufficiently developed to permit consideration.

establish that the right-of-way is not a Class VI highway and is not a town road do not affect the context in which the accused interference occurred, when the town believed it had authority to control the right-of-way as Solomon Harmon Road.

Both the superior court and the New Hampshire Supreme Court held, in the context of denying Bourne an award of attorneys' fees, that the town did not act unreasonably in defending its position as to the status of Solomon Harmon Road.  Federal courts give full faith and credit to state court judgments and "give them the same preclusive effect as would a court of that state." Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 481 (1st Cir. 2009) (citing 28 U.S.C. § 1738).  Under New Hampshire law, a party to prior litigation is barred "from relitigating any issue of fact actually litigated and determined in the prior action." In re Zachary G., 159 N.H. 146, 151 (2009) (internal quotation marks omitted).  For collateral estoppel to apply, three conditions must be met:  "(1) the issue subject to estoppel must be identical in each action; (2) the first action must have resolved the issue finally on the merits; and (3) the party to be estopped must have appeared as a party in the first action, . . . ."  Stewart v. Bader, 154 N.H. 75, 80-81 (2006).

Although the claim for an award of fees in the state case is different from the claim here that the defendants improperly

interfered with Bourne's efforts to maintain the roadway, the
underlying factual issue is the same:  whether the town acted
reasonably in asserting authority and control over Solomon Harmon
Road.  The New Hampshire Supreme Court resolved the issue on the
merits, and Bourne was a party in the state court cases.  Under §
1738, this court must give full faith and credit to the state
court decisions, despite Bourne's charges that the state court
erred and was defrauded.  Therefore, Bourne is estopped from
asserting that the town acted unreasonably in maintaining its
position that the right-of-way, known then as Solomon Harmon
Road, was a Class VI highway subject to the town's authority and
control during the period between 2003 and 2006.

     As is amply shown by the record of events between 2002 and
2006, the town did not improperly interfere with Bourne's
contractual relations with third parties to maintain or improve
the right-of-way.


          B.  <u>Electrical Service Installation</u>
     The defendants assert that the delay in installing
electrical service to Bourne's property was caused by the <u>Cyr</u>
litigation that blocked improvement of the right-of-way which was
a necessary predicate before the poles and wires for electrical
service could be installed.  Once the <u>Cyr</u> litigation was

resolved, the defendants point out, the town approved the
proposal for electrical installation.  Bourne argues that the
defendants, not the Cyr litigation, blocked electrical service
installation from September 15, 2003, to April 25, 2006, when
approval was granted.

The record establishes that during the time in question the
town and the individual defendants believed that the disputed
right-of-way was a town road known as Solomon Harmon Road.
During the same time, Bourne and the Cyrs disputed the right to
use and control the right-of-way.  Bourne's litigation with the
Cyrs involved injunctions that prevented improvements to the
right-of-way, such as cutting trees, that were necessary before
electrical power installation could begin.  For example, in
November of 2003, the court ordered that Bourne could improve the
right-of-way but only to the extent allowed by the town, which
was presented in a letter from town counsel.  Bourne was later
found to be in contempt of that order.  Taken in the broader
context of Bourne's dispute with the Cyrs and the state court
orders generated in the course of that litigation, the defendants
have shown that their actions with respect to interfering with
the installation of electrical power to Bourne's property were
not improper.

Bourne attributes bad faith and improper motives to the

30

defendants, based on his interpretation of various occurrences, communications, and interactions.  Seen from Bourne's vantage point, the opposition Bourne encountered from the town and several of its residents understandably might lead him to conclude that they wanted to exclude him, as an outsider, and wanted to preserve control over Solomon Harmon Road at any cost. Bourne felt victimized by the treatment he encountered and sought retribution.  The town's handling of the situation at times appeared to be inept and ill-advised.  As is evident from the traverse of this case, which has been discussed in some detail, common sense and reason were relegated to the sidelines while the disputes between the parties escalated into years of costly litigation, which is continuing in state court.

However, inhospitable actions and ineptitude as shown in this case do not prove a claim of improper interference with contract.  "To defeat a motion for summary judgment, evidence offered by the non-movant must be significantly probative of specific facts."  Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008) (internal quotation marks omitted).  Bourne's evidence in support of his version of events does not provide sufficient proof to show a genuine factual dispute, which is necessary to avoid summary judgment.  Instead, the record supports the defendants' position that their actions did not cause the delay

31

in electrical service installation.  Therefore, the defendants are entitled to summary judgment on Bourne's claim of intentional interference with contract.

<u>Conclusion</u>

For the foregoing reasons, the plaintiff's motion for summary judgment (document no. 148) is denied.  The defendants' motion for summary judgment (document no. 187) is granted.

The clerk of court shall enter judgment in accord with the order issued on June 29, 2007, (docket no. 104) and this order and close the case.

SO ORDERED.

<u>/s/ Joseph A. DiClerico, Jr.</u>
Joseph A. DiClerico, Jr.
United States District Judge

May 12, 2010

cc:  Samuel J. Bourne, pro se
     Brian J. S. Cullen, Esq.
     Richard D. Sager, Esq.

32